452 F.2d 315
 3 Fair Empl.Prac.Cas. 900,
4 Fair Empl.Prac.Cas. 121,
3 Empl. Prac. Dec. P 8335,
4 Empl. Prac. Dec. P 7616
Gerald CARTER et al., Plaintiffs-Appellees, and Minneapolis
Commission on Human Relations, Plaintiff-Intervenor-Appellee,
v.
Hugh GALLAGHER et al., Defendants-Appellants.
 No. 71-1181.
 United States Court of Appeals,
Eighth Circuit.
 Sept. 9, 1971.
On Rehearing En Banc Jan. 7, 1972.
 
 Arvid M. Falk, Asst. City Atty., Keith M. Stidd, City Atty., Minneapolis, Minn., for defendants-appellants.
 Luther A. Granquist, Marino, Becker & Granquist, Bernard Becker, Legal Aid Society, Inc., Minneapolis, Minn., for plaintiffs-appellees Gerald Carter et al.; Kirk A. Gustafson, Minneapolis, Minn., Legal Aid Society of Minneapolis, on the brief.
 Charles Quaintance, Jr., Hyman Edelman, Minneapolis, Minn., for plaintiff-appellee Minneapolis Commission On Human Relations.
 O. C. Adamson, II, Minneapolis, Minn., amici curiae Fire Fighters Association of Minneapolis, Local 82, Associated Fire Fighters of Minnesota, and International Assn. of Fire Fighters.
 Before MATTHES, Chief Judge, VAN OOSTERHOUT, Circuit Judge and EISELE, District Judge.
 VAN OOSTERHOUT, Circuit Judge.
 
 
 1
 This is an appeal by defendants from decree enjoining them from holding examinations and setting standards for the purpose of determining qualifications of applicants for positions on the Minneapolis Fire Department until various racially discriminatory practices are corrected as directed in the trial court's decree and providing for absolute minority preference in employment of twenty minority persons.
 
 
 2
 This action for injunctive and declaratory relief was brought by five Blacks on behalf of themselves and all persons similarly situated. The classes represented by plaintiffs are:
 
 
 3
 (a) All those Black, Indian and other minority persons presently applying for employment with the Minneapolis Fire Department.
 
 
 4
 (b) All those Black, Indian and other minority persons in the City of Minneapolis who are not applicants for employment with the Minneapolis Fire Department either because their applications were not approved or because they believed that equal employment opportunity is denied to Black, Indian and other minority applicants for such employment.
 
 
 5
 For convenience the plaintiffs and the classes they represent will usually be referred to as minority persons.
 
 
 6
 The defendants, who are sued in their official capacity and individually, are Gallagher, Glover and Canfield, the members of the Civil Service Commission of the City of Minneapolis; Proctor, the Personnel Director of the Commission; and Fire Chief Hall.
 
 
 7
 The court permitted the case to proceed as a class action. No challenge is made to class representation.
 
 
 8
 The Minneapolis Commission on Human Relations has intervened on behalf of plaintiffs. Fire Fighters Association of Minneapolis, Associated Fire Fighters of Minnesota and International Association of Fire Fighters have jointly filed amici curiae brief in support of defendants' position.
 
 
 9
 Included in the petition is another class represented by plaintiffs Harris and Hill consisting of:
 
 
 10
 (c) All those persons who would qualify as veterans pursuant to Minnesota Statute 197.45 in seeking to claim a veterans' preference pursuant to said section but for the state and local durational residency requirements imposed therein.
 
 
 11
 The class "c" plaintiffs make the contention that the five-year durational residency requirement incorporated in the definition of veterans in the Veterans Preference Act, Minnesota Statute 197.45, unconstitutionally imposes a penalty on the right to travel interstate. A three-judge court was designated to try such issue and hence the issue is not adjudicated in the present action. Judge Larson, who tried this case, entered a temporary restraining order prohibiting defendants from denying veterans preference under Sec. 197.45 to any applicant for employment by reason of failure to meet residence requirements incorporated in the statute. Appeal from the granting of the temporary restraining order has been taken. However, no attack on the order is made in the briefs, and hence we give such issue no consideration at this time.[1]
 
 
 12
 Plaintiffs assert that the recruitment, examination and hiring practices of defendants with respect to the fire department deny Blacks, Indians and other members of minority groups the right to due process of law and equal protection of the law guaranteed by the Fourteenth Amendment and the right not to be discriminated against in employment by reason of race as guaranteed by 42 U.S.C.A. Sec. 1981.
 
 
 13
 This case was tried to the court. Much of the evidence was stipulated. An evidentiary hearing was held, a number of witnesses were produced and examined. The evidence to the extent necessary will be discussed in the course of the opinion.
 
 
 14
 Judge Larson made 146 findings of fact, which generally upheld plaintiffs' contentions, and appropriate conclusions of law. Based thereon, he entered a decree, not reported, on March 9, 1971, which reads as follows:
 
 
 15
 "The plaintiffs have moved this Court for various injunctive orders requiring the defendants to implement certain hiring practices and procedures with respect to the position of fire fighter within the Minneapolis Fire Department. The plaintiffs have also moved the Court to request the convening of a three-judge court to hear and determine the constitutionality of the five-year State and local residency requirement incorporated in the Minnesota Veterans Preference Act and to enjoin the enforcement of the requirement of said Act pending the hearing and determination of the three-judge court.
 
 
 16
 "On the basis of the record and the proceedings herein, the evidence presented to the Court, the arguments of counsel, and the findings of fact and conclusions of law filed in this case this date, it is the ORDER, JUDGMENT and DECREE of this Court:
 
 
 17
 "1. That the defendants herein, their successors in office, agents, servants, and employees, and all persons in active concert or participation with them, give absolute preference in certification as fire fighters with the Minneapolis Fire Department to twenty (20) Black, American-Indian, or Spanish-surnamed-American applicants for fire fighter who qualify for such positions on the basis of the examinations given pursuant to the Minneapolis Civil Service Commission fire fighter examination plan number 8326, or subsequent examination plans, and who meet the requirements of said examination plans as amended pursuant to paragraph seven (7) of this Decree.
 
 
 18
 "2. That the defendants herein, their successors in office, agents, servants, and employees, and all persons in active concert or participation with them.
 
 
 19
 (a) establish an eligibility list of all Black, American-Indian, or Spanish-surnamed-American applicants for the position of fire fighter with the Minneapolis Fire Department who qualify for such positions on the basis of the examinations given pursuant to the Minneapolis Civil Service Commission fire fighter examination plan number 8326 and who meet the requirements of said examination plan as amended pursuant to paragraph seven (7) of this Decree, and
 
 
 20
 (b) rank said minority applicants in order of their relative standing on said examinations with those persons eligible for a veterans preference or for a residence preference given such preference on said eligibility list, and
 
 
 21
 (c) Proceed with the certification of fire fighter applicants from the full eligibility list established on the basis of said examinations only after twenty positions have been filled from the eligibility list established pursuant to paragraph 2(a) of this Decree or after all persons on the eligibility list established pursuant to paragraph 2(a) of this Decree have been offered certification for the position of fire fighter with the Minneapolis Fire Department and have had a period of five (5) business days within which to accept or reject such certification.
 
 
 22
 (d) In the event that all preferred minority positions are not filled from the register established by examination plan number 8326, the same procedure will be followed on succeeding examination plans until all such twenty (20) preferred positions are filled by minority applicants.
 
 
 23
 "3. That the defendants herein, their successors in office, agents, servants and employees, and all persons in active concert or participation with them, are enjoined from enforcing the provisions of Minnesota Statutes Sec. 197.45 and the provisions of the Minneapolis City Charter, chapter 19, sections 7 and 15, insofar as such enforcement is in conflict with the Order of the Court contained in paragraph one (1) of this Decree.
 
 
 24
 "4. That the defendants Gallagher, Canfield, Glover, Proctor, and White, their successors in office, agents, servants, and employees, and all persons in active concert or participation with them, shall reopen the application period for the next examination for the position of fire fighter for the primary purpose of receiving applications from Blacks, American-Indians, or Spanish-surnamed-American persons for a period of two weeks to commence forthwith upon the completion and implementation of the affirmative recruitment program required pursuant to paragraph five (5) of this Decree.
 
 
 25
 "5. That the defendants herein, their successors in office, agents, servants, and employees, and all persons in active concert or participation with them, shall prepare and submit to the Court and counsel for the plaintiffs and the plaintiff-intervenor, no later than two weeks from the date of this Decree a plan for affirmative action for the recruitment of Black, American-Indian, and Spanish-surnamed-American persons for the position of fire fighter with the Minneapolis Fire Department, which plan shall include:
 
 
 26
 (a) Provision for the active participation in such affirmative action program of all the defendants in this action,
 
 
 27
 (b) Provision for consultation by the defendants herein and members of the staff of the Minneapolis Civil Service Commission with representatives of the City and community agencies and groups which have direct contact with the minority community in Minneapolis, and
 
 
 28
 (c) Provision for pretest tutoring sessions involving personnel from the Civil Service Commission staff and from the Minneapolis Fire Department, and
 
 
 29
 (d) Provision for the maximum feasible use of all communication media most likely to reach the minority community in Minneapolis, and
 
 
 30
 (e) Incorporation in the promotional material used, including all advertising used, of a statement referring to the Court's Order granting a minority preference as set forth in paragraph one (1) of this Decree, a statement regarding all changes made in examination plan number 8326 as set forth in paragraph seven (7) of this Decree, and a statement regarding the availability of pretesting tutoring sessions established pursuant to paragraph 5(c) of this Decree.
 
 
 31
 "6. That the defendants Gallagher, Canfield, Glover, Proctor and White, their successors in office, agents, servants, and employees, and all persons in active concert or participation with them, shall not give examinations pursuant to the Minneapolis Civil Service Commission examination plan number 8326 until the following action has been taken:
 
 
 32
 (a) The written examination for fire fighter with the Minneapolis Fire Department given pursuant to said examination plan has been validated by procedures commensurate with those set forth in the Equal Employment Opportunity Commission Guidelines on Employment Testing Procedures set forth in 35 F.R. 12333, et seq. (Aug. 1, 1970), 29 C.F.R. Secs. 1607.1 to 1607.14, and
 
 
 33
 (b) The Court and counsel for the plaintiffs and the plaintiff-intervenor have been given copies of said written examination for fire fighter with the Minneapolis Fire Department and copies of all reports, including a resume of any oral reports, which are made by the defendants, their employees, or any consultant working with them, regarding validation studies of said written examination provided that such copies of said written examination and such copies of said reports may be given to the court and counsel for the plaintiff and the plaintiff-intervenor subject to a protective order in a form approved by the Court, and
 
 
 34
 (c) Counsel for the plaintiffs and the plaintiff-intervenor have been given notice at least two weeks prior to the date scheduled for administration of said written examination, and
 
 
 35
 (d) All action required by paragraphs four (4), five (5), seven (7) and eight (8) of this Decree has been completed.
 
 
 36
 "7. The defendants Gallagher, Canfield, Glover, Proctor, and White, their successors in office, agents, servants, and employees, and all persons in active concert or participation with them, shall make the following permanent changes in the Minneapolis Civil Service Commission fire fighter examination plan number 8326 and all subsequent examination plans:
 
 
 37
 (a) Delete therefrom any reference to the applicant's arrest record, and
 
 
 38
 (b) Incorporate in said fire fighter examination plan provisions to the effect that:
 
 
 39
 (i) no person will be rejected as an applicant for the position of fire fighter with the Minneapolis Fire Department by reason of the conviction of any felony or felonies at any time prior to five years from the date of application or by reason of the conviction of any misdemeanor or misdemeanors at any time prior to two years from the date of application, provided that the applicant was not incarcerated upon the conviction of any felony or misdemeanor during said five or two year periods, and
 
 
 40
 (ii) no person will be rejected as an applicant for the position of fire fighter with the Minneapolis Fire Department by reason of the conviction of any felony, misdemeanor, or other criminal act, or the conviction of felonies, misdemeanors, or other criminal acts, except upon a written finding by the Civil Service Commission after notice to the applicant and an opportunity to respond in person or in writing that
 
 
 41
 a. the act or acts upon which such convictions were based, considering the circumstances in which it occurred, involve behavior from which it can reasonably be inferred that such applicant cannot adequately fulfill the duties of a fire fighter with the Minneapolis Fire Department.
 
 
 42
 (c) Delete from said fire fighter examination plan the requirement that an applicant must have a high school diploma or a G.E.D. certificate by the time he is hired, provided that an entering fireman may be required within two years of entering upon duty to obtain a high school diploma or a G.E.D. equivalency certificate, and
 
 
 43
 (d) Change the minimum age requirement as stated in said fire fighter examination plan from twenty years to eighteen years, and change the maximum age limit from thirty years to thirty-five years, provided that the maximum age may be reduced to thirty at such time as there are twenty Blacks, American-Indians and Spanish-surnamed-Americans employed by the Minneapolis Fire Department.
 
 
 44
 "8. That the defendants, their successors in office, agents, servants, and employees, and all persons in active concert or participation with them, shall
 
 
 45
 (a) refrain from requesting or considering any information regarding an applicant's arrest record when determining the eligibility of an applicant for a position with the Minneapolis Fire Department, and
 
 
 46
 (b) incorporate all the changes ordered in Minneapolis Civil Service Commission fire fighter examination plan number 8326 pursuant to paragraph seven (7) of this Decree in all information, pamphlets, announcements or other material utilized as part of the affirmative recruitment program undertaken pursuant to paragraph five (5) of this Decree.
 
 
 47
 "9. That the defendants herein, their successors in office, agents, servants, and employees, and all persons in active concert or participation with them, shall
 
 
 48
 (a) within six months of the date of the Order, submit to the Court and counsel for the plaintiffs and the plaintiff-intervenor, a plan for affirmative action to assure that all recruitment, examination, and hiring practices followed in obtaining employees for the Minneapolis Fire Department are designed to assure equal employment opportunities for Blacks, American-Indians and Spanish-surnamed-Americans, which affirmative plan shall include procedures commensurate with the Equal Employment Opportunity Commission Guidelines on Employment Testing Procedures set forth in 35 F.R. 12333, et seq. (Aug. 1, 1970), 29 C.F.R. Secs. 1607.1-1607.14 to insure that all examinations given to applicants for employment with the Minneapolis Fire Department are validated to insure that they do not discriminate against Blacks, American-Indians, and Spanish-surnamed-Americans, and that the results obtained will provide a reasonable prediction of job performance with the Minneapolis Fire Department, and
 
 
 49
 (b) to report forthwith to the Court and counsel for the plaintiffs and the plaintiff-intervenor the number and names of all Blacks, American-Indians, and Spanish-surnamed-Americans who are certified as fire fighters pursuant to fire fighter examination number 8326, and
 
 
 50
 (c) to report forthwith to the Court and counsel for the plaintiffs and plaintiff-intervenor the names of all Black, American-Indian, and Spanish-surnamed-American applicants who are not found eligible for certification as fire fighters with the Minneapolis Fire Department or who, after being found eligible for such certification, are not in fact certified at any time when eligible candidates are being certified, together with a statement as to the reasons for the failure to find such applicants eligible or the failure to certify them, and
 
 
 51
 (d) to report forthwith to the Court and counsel for the plaintiffs and the plaintiff-intervenor the name of any Black, American-Indian, or Spanish-surnamed-American applicant for fire fighter with the Minneapolis Fire Department who, having been certified for such employment, subsequently is dismissed or who subsequently terminates his employment, together with a statement as to the reason for such dismissal or termination.
 
 
 52
 "10. That the Court shall maintain continuing jurisdiction of this action."
 
 
 53
 (Paragraph 11 relates to the temporary restraining order on the Sec. 197.45 issue, the attack upon which was not pursued in the present appeal.)
 
 
 54
 Judge Larson on April 4, 1971, entered an order for stay pending appeal, reading:
 
 
 55
 "Defendants move for an Order staying the Decree, particularly paragraphs 1 through 10, pending the appeal.
 
 
 56
 "Plaintiffs move for an Order to Show Cause why defendants should not be held in contempt for failure to comply with paragraph (5) of the Decree entered March 9, 1971.
 
 
 57
 "The recent decision of the United States in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) indicates paragraph 6(a) must be complied with. The Court understands that defendants are proceeding with the revision in tests and the validation thereof.
 
 
 58
 "IT IS ORDERED:
 
 
 59
 1. That defendants comply with paragraphs 6(a), (b) and (c) of the Decree of March 9, 1971.
 
 
 60
 2. That the defendants comply with paragraph (5) of the Decree and submit such plan within two weeks of the completion of the validation of the tests.
 
 
 61
 3. That the motion for a stay be granted except as provided in 1 and 2, above."
 
 
 62
 Defendants urge that the court's judgment and decree should be reversed and vacated for the following reasons:
 
 
 63
 I. The District Court lacks jurisdiction to determine plaintiffs' claims.
 
 
 64
 II. Substantial evidence is lacking to support certain specified findings of fact, the resulting conclusions of law, and the decree and judgment.
 
 
 65
 III. The court wrongly deprived the Civil Service Commission of discretionary powers vested in it under the provisions of the Minneapolis Home Rule Charter and the rules of the Minneapolis Civil Service Commission.
 
 
 66
 IV. The court abused its discretion in granting injunctive relief since the record shows the Commission has taken steps to insure that the examination and other employment standards will not be discriminatory.
 
 
 67
 V. The court erred in ordering absolute minority preference in employment of twenty minority persons.
 
 
 68
 VI. The court erred in granting other injunctive relief.
 
 
 69
 Such contentions will be considered in the order just stated.
 
 I.
 
 70
 Jurisdiction is based upon 28 U.S.C.A. Secs. 1331 and 1343(3) and (4). Defendants attack the jurisdiction of the trial court upon several grounds, all of which lack merit. Plaintiffs do not base jurisdiction on Title 7 of the Civil Rights Act of 1964. Hence the question of whether defendants come within the exclusion of a state or political subdivision thereof from the definition of employer incorporated in Title 7 is immaterial. The claim of immunity from suit by public officials if it exists does not defeat plaintiffs' right to injunctive relief against state officials in their individual capacities where such officers have acted to deprive a person of a federally guaranteed constitutional right. Ex parte Young, 209 U.S. 123, 167, 28 S.Ct. 441, 52 L.Ed. 714; Board of Trustees of Arkansas A & M College v. Davis, 8 Cir., 396 F.2d 730, 732-733.
 
 
 71
 No claim for monetary damages is presented in this case. No exhaustion of state remedies is required under the circumstances of this case. See Monroe v. Pape, 365 U.S. 167, 183, 81 S.Ct. 473, 5 L.Ed.2d 492. Jurisdiction is established under the old Civil Rights Act, 42 U.S.C.A. Secs. 1981 and 1983, and 28 U.S.C.A. Sec. 1343(3) and (4). See Smith v. Board of Education of Morrilton Sch. Dist., 8 Cir., 365 F.2d 770, 773; Penn v. Stumpf, N.D.Cal., 308 F.Supp. 1238. The petition alleges the amount in controversy for each person discriminatorily denied employment exceeds $10,000. Thus federal question jurisdiction would also appear to be established under 28 U.S.C.A. Sec. 1331.
 
 II.
 
 72
 Defendants urge that some 27 specified findings of fact out of the 146 findings made by the trial court are not supported by substantial evidence. Such argument is summarily made. We have carefully examined the record and are convinced that the procedures existing prior to the commencement of this suit for testing applicants' eligibility for a fireman's position were racially discriminatory. The evidence shows that of the 535 men in the fire department none are Black, Indian or Mexican-Americans. Only two Blacks had served on the fire department in the recent past. Blacks constituted 6.44% of the Minneapolis population in 1970. The court found the all-White fire department was the result of past discriminatory hiring practices and procedures. Statistical evidence can make a prima facie case of discrimination. Parham v. Southwestern Bell Telephone Co., 8 Cir., 433 F.2d 421, 426. The court found that there was no substantial evidence to rebut the inference of racial discrimination based upon the statistics.
 
 
 73
 Subsequent to the commencement of this action, the record reflects that the Commission recognized that its written examination was racially discriminatory. Substantial changes were made in its content. Consideration of the arrest record of applicants was eliminated and other changes were made. The record shows that Fire Chief Hall took a strong position against recruitment and employment of Blacks.
 
 
 74
 The court made no express finding of bad faith or evil motives on the part of the defendants. Neither 42 U.S.C.A. Secs. 1981 nor 1983 incorporates any requirement that discrimination be wilfull or intentional. In an analogous situation arising under Title 7 of the Civil Rights Act, the Supreme Court states: "good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability." Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (March 8, 1971).
 
 
 75
 Defendants' own testimony affirmatively shows the testing procedure in issue prior to the commencement of the action was racially discriminatory.
 
 III.
 
 76
 The city of Minneapolis is governed by a Home Rule Charter under which it is authorized to establish a civil service system for the city. The Minnesota Supreme Court in State ex rel. Coduti v. Hauser, 219 Minn. 297, 17 N.W.2d 504, 507, holds:
 
 
 77
 "'The rules of the Commission, having all the force and effect of statutory law, should be sustained unless they violate constitutional guaranties, controlling state legislation or the provisions of the [Minneapolis home-rule] charter pursuant to which they were adopted."'
 
 
 78
 The Commission, like school boards in school integration cases, has the primary responsibility for carrying out the duties assigned to it and has a large discretion in mapping the course it is to follow. However, such discretionary power does not go to the extent of authorizing the adoption of rules and procedures which violate constitutional rights of minority persons seeking employment. We have heretofore determined that the constitutional rights of minority persons have been violated by the present procedures adopted by the Commission.
 
 IV.
 
 79
 Defendants contend that the court abused its discretion in granting injunctive relief and usurped the Commission's power to promulgate rules and regulations with respect to firemen's qualifications and examinations. Defendants, who are the present members of the Civil Service Commission, ever since their recent appointment have discussed their rules and examinations with civic groups and interested parties and have made changes in their rules designed to eliminate racial discrimination, and they have agreed to employ competent experts to validate future examinations and to take steps to promote recruitment of minority persons for firemen positions. In effect, they have expressed a willing-ness to substantially comply with the provisions of paragraphs 5 and 6(a), (b) and (c), of the decree heretofore quoted which are the provisions the court excluded from the operation of its stay order pending appeal. Defendants have also eliminated any consideration of arrests in determining applicants qualifications and have made modifications in the educational and age requirements. Defendants take the position that such steps have eliminated any need for injunctive relief.
 
 
 80
 Generally the granting or denial of an injunction to remedy illegal conduct in situations where good faith effort has been made to remedy the wrong rests in the sound discretion of the trial court. Parham v. Southwestern Bell Telephone Co., 8 Cir., 433 F.2d 421, 429; Hodgson v. American Can Co., 8 Cir., 440 F.2d 916, 920.
 
 
 81
 Upon the record before us, defendants have not demonstrated that the court abused its discretion in granting injunctive relief.
 
 V.
 
 82
 Defendants most vigorous attack upon the injunction decree is directed toward paragraph 1 creating absolute preference in fire department employment to twenty minority persons who meet the qualifications for the position under the revised qualification standards established by the decree. Paragraphs 2 and 3 of the decree implement the provisions of paragraph 1.
 
 
 83
 Defendants contend that such minority preference order violates the Fourteenth Amendment in that it discriminates against White applicants whose qualifications are found to be superior to those of the minority applicants upon the basis of approved and acceptable job related tests and standards, and who, but for the minority preference requirement, would be entitled to priority in employment.
 
 
 84
 Plaintiffs, citing Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709, and Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), urge that the District Court has the power and duty to exercise its equitable powers to fashion a remedy which will so far as possible eliminate the present effects of past discrimination as well as bar like discrimination in the future.
 
 
 85
 Courts of equity have a broad power to fashion and effective remedy. However, the power to provide an effective remedy affords no basis for depriving others of a constitutionally protected right. Plaintiffs in effect concede this in their brief when they state: "Initially, we assume the obvious-that the District Court could not order the city official to take any action which would itself be unconstitutional."
 
 
 86
 Thus we reach the crucial question which is whether giving absolute preference to twenty minority applicants who meet the qualification tests infringes upon the constitutional rights of white applicants whose qualifications are established to be superior. The trial court based the minority preference on violation of 42 U.S.C.A. Sec. 1981 which reads:
 
 
 87
 "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."Plaintiffs in their brief properly state the law as follows:
 
 
 88
 "For the past 90 years the Supreme Court has recognized that the Congress intended section 1981 to have as broad a scope as the Fourteenth Amendment where state action is involved. In Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1880), the Court stated with respect to Rev.Stat. 1977 (now section 1981) that 'this Act puts in the form of a statute what had been substantially ordained by the Constitutional Amendment.' 100 U.S. at 312. In context the Court is referring to the Fourteenth Amendment. On the same day, in Virginia v. Rives, 100 U.S. 313, 317-318, 25 L.Ed. 667 (1880), the Court treated the Civil Rights Act and the Fourteenth Amendment as coextensive in substance. The close relationship between the Civil Rights Act of 1866 and the Fourteenth Amendment has been consistently emphasized by the Court. * * *"
 
 
 89
 Section 1981 and the Fourteenth Amendment by their plain and unambiguous language accord equal rights to all persons regardless of race. We believe that Sec. 1981 and the Fourteenth Amendment proscribe any discrimination in employment based on race, whether the discrimination be against Whites or Blacks. Our view is supported by Griggs, supra, where it is held:
 
 
 90
 "Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." 401 U.S. 424, 430-431, 91 S.Ct. 849, 853.
 
 
 91
 Under the charter and the civil service provisions properly administered, preference is to be accorded to the fire fighter applicant having the highest rating. Under the court's minority preference provision, a White person who, in a subsequently conducted examination fairly conducted and free of racial discrimination, obtains a higher rating than a minority person is denied employment solely because he is a White man. The fact that some unnamed and unknown White person in the distant past may, by reason of past racial discrimination in which the present applicant in no way participated, have received preference over some unidentified minority person with higher qualifications is no justification for discriminating against the present better qualified applicant upon the basis of race.
 
 
 92
 In our view, no authority has been cited which would support such racial discrimination. We are convinced that the minority preference provision of the decree discriminates in favor of minority persons and against Whites whose qualifications are fairly established to be superior to minority persons given preference by the decree.
 
 
 93
 School integration cases such as Swann, supra, are clearly distinguishable. Whites have no constitutional right to insist upon segregated schools. No constitutional rights of Whites are involved in decrees ordering school integration.
 
 
 94
 Cases such as Local 53 of Int. Ass'n of Heat & Frost I. & A. Workers v. Vogler, 5 Cir., 407 F.2d 1047, are distinguishable. In Vogler, the court upheld the trial court's finding that three Blacks and one Mexican had applied for union membership and had been discriminatorily denied membership solely upon the basis of their race. The court ordered the union to give such identified persons union membership. The relief was granted to specific persons who were wrongly denied membership. Moreover, the issue of reverse discrimination was not raised or considered by the court.
 
 
 95
 In our present case, there is no claim or showing made that plaintiffs were identified members of the class who made prior applications for employment and were denied employment solely because of race. Thus we do not have a situation where a specified minority person having superior qualifications to a White fire fighter applicant has shown that he, himself, has been damaged or injured by a discriminatory refusal of employment.
 
 VI.
 
 96
 Defendants claim the injunctive relief granted is too broad in other respects. In Griggs, supra, the standard laid down for determining the validity of tests and job standards is thus stated:
 
 
 97
 "The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." 401 U.S. 424, 431, 91 S.Ct. 849, 853.
 
 
 98
 Such standard is appropriate to test the relief granted upon the basis of the record made in this case. We shall proceed to examine and determine the validity of the relief granted in paragraphs 4 to 10, inclusive, of the decree, supra.
 
 
 99
 We affirm and approve the provisions of paragraphs 4 and 5 requiring the reopening of applications for the next examination and the requirement that an affirmative plan for recruitment of minority persons be promptly submitted to the court for approval. We disapprove, however, of that part of paragraph 5(e) which requires publicity for the minority preference provision which we have heretofore disapproved.
 
 
 100
 The provisions of paragraph 6 are approved and affirmed except for the modification of paragraph 6(d) to the extent that it is consistent with the views expressed in this opinion.
 
 
 101
 The provisions of paragraph 7(a) relating to the elimination of applicants' arrest records is approved.
 
 
 102
 The provisions of paragraph 7(b), particularly subdivision (i) thereof, are too broad. The parties agree that a conviction of a felony or misdemeanor should not per se constitute an absolute bar to employment. We are persuaded by defendants' argument that applicants' conviction records, at least in cases of aggravated offenses and multiple convictions, may have a bearing on the suitability of an applicant for a fire department position both from the standpoint of protecting fellow firemen and the public. The trial court in its discretion may require the defendants to submit to it for approval a rule with respect to the consideration to be given to an applicant's conviction record, which at a minimum should not treat conviction as an absolute bar to employment. We would not consider any rule giving fair consideration to the bearing of the conviction upon applicant's fitness for the fire fighter job to be inappropriate.
 
 
 103
 The provisions of paragraph 7(c) relating to educational requirements are approved and affirmed. We note that no complaint is made that the court did not go far enough in this respect.
 
 
 104
 The provision of paragraph 7(d) reducing the minimum age requirement is disapproved. Absent racial discrimination, it is appropriate for employers to fix age requirements. There is no adequate evidentiary basis to support a finding that the minimum age requirement is racially discriminatory.
 
 
 105
 By reason of past racial discrimination, we approve the 7(d) temporary enlargement of the maximum age requirement from thirty to thirty-five years.
 
 
 106
 The provisions of paragraph 8 are adequately covered by other provisions of the decree.
 
 
 107
 By reason of the lapse of time from the entry of the decree and the likelihood that changes have subsequently been made, the provisions of paragraph 9 of the decree can to the extent necessary be best realized under the continuing jurisdiction provisions of paragraph 10.
 
 
 108
 We agree that the court should maintain continuing jurisdiction of this action for a sufficient period of time to reasonably assure it that racial discrimination has been eliminated in filling positions on the fire department. The court may require such reports and information as it deems necessary and issue such orders as may be required to accomplish the objective of eliminating racial discrimination in the employment of fire fighters.
 
 
 109
 The trial court's determination that past racial discrimination against minority persons applying for fire fighters' positions has been established is affirmed. The court's decree to the extent that it gives absolute preference to twenty applicants is reversed and vacated. In other respects, the court's decree and judgment is affirmed to the extent indicated in this opinion.
 
 
 110
 The case is remanded for further proceedings consistent with the views herein expressed.
 
 
 111
 Costs are taxed two-thirds to defendants-appellants and one-third to plaintiffs-appellees.
 
 
 112
 Before MATTHES, Chief Judge, VAN OOSTERHOUT, Senior Circuit Judge, and MEHAFFY, GIBSON, LAY, HEANEY, BRIGHT, ROSS and STEPHENSON, En Banc.
 
 
 113
 On Petition For Rehearing En Banc.
 
 
 114
 GIBSON, Circuit Judge.
 
 
 115
 A panel of this court composed of Matthes, Chief Judge, Van Oosterhout, Senior Judge, and Eisele, District Judge from the Eastern District of Arkansas sitting by designation, in an opinion, authored by Judge Van Oosterhout,[1] sustained the order and opinion of the Honorable Earl R. Larson, District Court of Minnesota, finding that the employment practices and procedures for determining qualifications of applicants for positions on the Minneapolis Fire Department were racially discriminatory in violation of the Equal Protection Clause of the Fourteenth Amendment and the Civil Rights Act of 1870, 42 U.S.C. Sec. 1981, and approved a number of corrective practices ordered so as to eliminate all racially discriminatory practices; but disapproved that part of Judge Larson's order providing for absolute minority preference in the employment of the next 20 persons to be hired by the department. The case was brought as a class action and relief was extended to minority groups as a class.
 
 
 116
 The panel opinion, while sustaining most of Judge Larson's findings and orders granting affirmative relief, did not approve of the absolute preference in Fire Department employment to 20 minority persons who met the qualifications for the positions under the revised qualification standards established by the decree and held that the absolute preference order infringed upon the constitutional rights of white applicants whose qualifications are established to be equal or superior to the minority applicants. That panel held:
 
 
 117
 "Section 1981 and the Fourteenth Amendment by their plain and unambiguous language accord equal rights to all persons regardless of race. We believe that Sec. 1981 and the Fourteenth Amendment proscribe any discrimination in employment based on race, whether the discrimination be against Whites or Blacks. Our view is supported by Griggs, supra, where it is held:
 
 
 118
 'Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.' 401 U.S. 424, 430-431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158."
 
 
 119
 A petition for rehearing en banc by the appellees was granted but limited solely to the issue of the appropriate remedy. The cause was resubmitted to the court en banc on briefs of the various parties and intervenors and without oral argument. The United States filed a brief as amicus curiae on behalf of the plaintiffs on the rehearing.
 
 
 120
 The facts are contained in the panel opinion and need not be repeated here. The fact of past racially discriminatory practices and procedures in employment by the Fire Department is accepted and clearly evidenced by the fact that of the 535 men in the Fire Department none are from minority groups.[2] We are thus here concerned only with the appropriateness of the remedy ordered by the District Court. The absolute preference of 20 minority persons who qualify has gone further than any of the reported appellate court cases in granting preference to overcome the effects of past discriminatory practices and does appear to violate the constitutional right of Equal Protection of the Law to white persons who are superiorly qualified.
 
 
 121
 The panel opinion has recognized the illegality of the past practices, has ordered those practices abandoned, and the affirmative establishment of nondiscriminatory practices and procedures. There is, as the panel pointed out, no claim or showing made that the plaintiffs were identifiable members of the class who had made prior applications for employment and were denied employment solely because of race. This latter situation could be remedied immediately by ordering the employment of such persons. However, in dealing with the abstraction of employment as a class, we are confronted with the proposition that in giving an absolute preference to a minority as a class over those of the white race who are either superiorly or equally qualified would constitute a violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution.
 
 
 122
 The defendants-appellants point out the mandatory requirements of the Minneapolis City and the Minnesota Veterans' Preference Act (Minnesota Statute Sec. 197.45). These requirements however must give way to the Supremacy Clause of Article 6 of the United States Constitution.
 
 
 123
 Mr. Justice Black, in speaking for a unanimous court (although Mr. Justice Harlan concurred on the basis of the Fifteenth Amendment rather than on the Fourteenth) in Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1964), approved the suspension of Louisiana voting laws that had been administered discriminatorily against Negroes and held it was the affirmative duty of the district court to eliminate the discriminatory effects of past practices, stating, "We bear in mind that the court has not merely the power but the duty to render a decree which so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." 380 U.S. at 154, 85 S.Ct. at 822. It is apparent that remedies to overcome the effects of past discrimination may suspend valid state laws. United States v. Mississippi, 339 F.2d 679 (5th Cir. 1964); United States v. Duke, 332 F.2d 759 (5th Cir. 1963).
 
 
 124
 Admittedly the District Court has wide power sitting as a court of equity to fashion relief enforcing the congressional mandate of the Civil Rights Acts and the constitutional guarantees of the Equal Protection of the Law; and clearly, courts of equity have the power to eradicate the effects of past discriminations. Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1971). We are not here concerned with the anti-preference treatment section 703(j) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e-2(j),[3] as this class action is predicated under Sec. 1981 of the old Civil Rights Act and the provisions of the Fourteenth Amendment. However, even the antipreference treatment section of the new Civil Rights Act of 1964 does not limit the power of a court to order affirmative relief to correct the effects of past unlawful practices. United States v. IBEW, Local No. 38, 428 F.2d 144 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970).
 
 
 125
 Although this case is not predicated upon Title VII of the Civil Rights Act of 1964 and most of the cases that have dealt with the issue of remedying past discriminatory practices along with prohibiting present discriminatory practices are under that Act, the remedies invoked in those cases offer some practical guidelines in dealing with this issue.
 
 
 126
 As the panel opinion points out most of these cases deal with discriminations to a specified individual who has been presently discriminated against on account of race, and the remedy is there easily applied as the individual who has been discriminated against can be presently ordered employed without running into the constitutional questions involved in granting preference to any one class over another. However, in United States v. Ironworkers Local 86, 443 F.2d 544 (9th Cir. 1971), cert. denied 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971) the Ninth Circuit approved the district court decree ordering building construction unions to offer immediate job referrals to previous racial discriminatees and also approved a prospective order requiring the unions to recruit sufficient blacks to comprise a 30 per cent membership in their apprenticeship programs. This was ordered in Seattle which had a black population of approximately 7 per cent. See, United States v. Local No. 86, Int. Ass'n of Bridge S., D. and R. Ironworkers et al., 315 F.Supp. 1202 (W.D.Wash.1970).
 
 
 127
 In Local 53 of Int. Ass'n of Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969), the trial court ordered the immediate admission into the union of three Negroes who were racially discriminated against in their application for membership and voided a local membership rule that in effect made the union a self-perpetuating nepotistic group, specifically ordering the union to develop objective criteria for membership and prospectively ordering the alternating of white and Negro referrals.
 
 
 128
 In United States v. Central Motor Lines, Inc., 325 F.Supp. 478 (W.D.N.C.1970), the trial court issued a preliminary injunction requiring the motor carrier to hire six Negro drivers "promptly," (apparently within two weeks from the date of the order), and that any future driviers hired were to be in an alternating ratio of one black to one white.
 
 
 129
 Cases arising from Executive Order # 11246, prohibiting all contractors and subcontractors on federally financed projects from discriminating in their employment practices, have also upheld plans which establish percentage goals for the employment of minority workers. See Contractors Association of Eastern Pa. v. Secretary of Labor, 442 F.2d 159 (3d Cir. 1971) (upholding the "Philadelphia Plan" requiring minority employment goals in the construction trades ranging from 19 per cent-26 per cent); Joyce v. McCrane, 320 F.Supp. 1284 (D.N.J.1970) (requiring contractors to employ 30 per cent-37 per cent minority journeymen).
 
 
 130
 It is also appropriate to note that precedent from our own Circuit establishes that the presence of identified persons who have been discriminated against is not a necessary prerequisite to ordering affirmative relief in order to eliminate the present effects of past discrimination. In United States v. Sheet Metal Workers Local 36, 416 F.2d 123 (8th Cir. 1969), we required substantial changes in union referral systems. In connection with this holding, Judge Heaney noted:
 
 
 131
 "We recognize that each of the cases cited in n. 15 to support our position can be distinguished on the ground that in each case, a number of known members of a minority group had been discriminated against after the passage of the Civil Rights Act. Here, we do not have such evidence, but we do not believe that it is necessary. The record does show that qualified Negro tradesmen have been and continue to be residents of the area. It further shows that they were acutely aware of the Locals' policies toward minority groups. It is also clear that they knew that even if they were permitted to use the referral system and become members of the union, they would have to work for at least a year before they could move into a priority group which would assure them reasonably full employment. In the light of this knowledge, it is unreasonable to expect that any Negro tradesman working for a Negro contractor or a nonconstruction white employer would seek to use the referral systems or to join either Local." Id. at 132.
 
 
 132
 It may also be pointed out that in actions under Title VII of the Civil Rights Act, 42 U.S.C. Sec. 2000e et seq., Congress has specifically granted authority to the trial courts to "order such affirmative action as may be appropriate, which may include * * * hiring of employees * * *." 42 U.S.C. Sec. 2000e-5(g) (emphasis added).
 
 
 133
 None of the remedies ordered or approved in the above cases involved an absolute preference for qualified minority persons for the first vacancies appearing in an employer's business, in contrast to the remedy ordered in the instant case. The absolute preference ordered by the trial court would operate as a present infringement on those non-minority group persons who are equally or superiorly qualified for the fire fighter's positions; and we hesitate to advocate implementation of one constitutional guarantee by the outright denial of another. Yet we acknowledge the legitimacy of erasing the effects of past racially discrminatory practices. Louisiana v. United States, supra. To accommodate these conflicting considerations, we think some reasonable ratio for hiring minority persons who can qualify under the revised qualification standards is in order for a limited period of time, or until there is a fair approximation of minority representation consistent with the population mix in the area. Such a procedure does not constitute a "quota" system because as soon as the trial court's order is fully implemented, all hirings will be on a racially nondiscriminatory basis, and it could well be that many more minority persons or less, as compared to the population at large, over a long period of time would apply and qualify for the positions. However, as a method of presently eliminating the effects of past racial discriminatory practices and in making meaningful in the immediate future the constitutional guarantees against racial discrimination, more than a token representation should be afforded. For these reasons we believe the trial court is possessed of the authority to order the hiring of 20 qualified minority persons, but this should be done without denying the constitutional rights of others by granting an absolute preference.
 
 
 134
 Ideas and views on ratios and procedures may vary widely but this issue should be resolved as soon as possible. In considering the equities of the decree and the difficulties that may be encountered in procuring qualified applicants from any of the racial groups, we feel that it would be in order for the district court to mandate that one out of every three persons hired by the Fire Department would be a minority individual who qualifies until at least 20 minority persons have been so hired.
 
 
 135
 Fashioning a remedy in these cases is of course a practical question which may differ substantially from case to case, depending on the circumstances. In reaching our conclusion in the instant case, we have been guided to some extent by the following considerations:
 
 
 136
 (1) It has now been established by the Supreme Court that the use of mathematical ratios as "a starting point in the process of shaping a remedy" is not un-constitutional and is "within the equitable remedial discretion of the District Court." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 25, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971).
 
 
 137
 (2) Given the past discriminatory hiring policies of the Minneapolis Fire Department, which were well known in the minority community, it is not unreasonable to assume that minority persons will still be reluctant to apply for emplpyment, absent some positive assurance that if qualified they will in fact be hired on a more than token basis.
 
 
 138
 (3) As the panel opinion noted, testing procedures required to qualify applicants are undergoing revision and validation at the present time. As the tests are currently utilized, applicants must attain a qualifying score in order to be certified at all. They are then ranked in order of eligibility according to their test scores (disregarding for present purposes the veteran's preference). Because of the absence of validation studies on the record before us, it is speculative to assume that the qualifying test, in addition to separating those applicants who are qualified from those who are not, also ranks qualified applicants with precision, statistical validity, and predictive significance. See generally, Cooper & Sobol, Seniority and Testing under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv.L.Rev. 1598, 1637-1669 (1969). Thus, a hiring remedy based on an alternating ratio such as we here suggest will by no means necessarily result in hiring less qualified minority persons in preference to more qualified white persons.
 
 
 139
 (4) While some of the remedial orders relied on by the plaintiffs and the Government ordered one to one ratios, they appear to be in areas and occupations with a more substantial minority population than the Minneapolis area. Thus we conclude that a one to two ratio would be appropriate here, until 20 qualified minority persons have been hired.
 
 
 140
 The panel opinion is adopted as the opinion of the court en banc with the exception of that part relating to the absolute preference.
 
 
 141
 The District Court properly retained jurisdiction pending full implementation of its decree and the remedy. Cause is remanded for further proceedings consistent with this opinion.
 
 
 142
 All costs of the appeal are to be assessed three-fourths against the defendant-appellants and one-fourth against the plaintiffs-appellees.
 
 
 143
 MATTHES, Chief Judge (concurring).
 
 
 144
 As the panel opinion shows, I was opposed to the absolute preference requirement as enunciated in the district court's opinion. Upon consideration of the petition for rehearing en banc, and briefs filed in support and opposition to the rehearing, I have concluded that the remedy fashioned by the opinion authored by Judge Gibson is appropriate and should be granted. Accordingly, I concur in the majority opinion on the petition for rehearing en banc.
 
 
 145
 VAN OOSTERHOUT, Senior Circuit Judge (dissenting).
 
 
 146
 For reasons stated in Division V of the panel opinion in this case, reported at 452 F.2d 324, I dissent from the en banc mandatory determination that one out of three persons hired by the Fire Department shall be a minority person until at least twenty minority persons are hired. Such provision in my opinion is vulnerable to the same constitutional infirmity as Judge Larson's absolute preference provision. This court's minority preference provision will not discriminate against as many white applicants as Judge Larson's decree but it will still give some minority persons preference in employment over white applicants whose qualifications are determined to be superior under fairly imposed standards and tests.
 
 
 147
 Employment preferences based on race are prohibited by the Fourteenth Amendment. This case is distinguishable from Swan v. Charlotte-Mecklenburg Board of Education relied upon by the majority in that whites have no right to insist upon segregated schools, while white as well as Black applicants cannot be denied employment on the basis of race.
 
 
 148
 I agree that a court of equity has broad power to frame an appropriate decree but such power does not extend to establishing provisions which deprive persons of constitutionally guaranteed rights.
 
 
 149
 Present and future applicants for firemen positions are in no way responsible for past discrimination. Plaintiffs have not shown that any plaintiff now seeking employment has personally suffered as a result of past discrimination by being denied employment over a less qualified white person. Past general racial discrimination against Blacks under the circumstances of this case does not justify unconstitutional present racial discrimination against white applicants. The court should of course go as far as is constitutionally permissible to eliminate racial discrimination in employment of firemen. Substantial steps in that direction have been taken by other provisions of Judge Larson's decree and the panel opinion.
 
 
 150
 MEHAFFY, Circuit Judge, joins in this dissent.
 
 
 
 [1]
 We are informed that the designated three-judge court by order filed August 6, 1971, determined that the Sec. 197.45 issue could be resolved by a single judge and dissolved itself. No further action has been taken on this issue
 
 
 [1]
 No. 71-1181, September 9, 1971
 
 
 [2]
 The total minority population of the Minneapolis area was 6.44 per cent in 1970; black population 4.37 per cent
 
 
 [3]
 42 U.S.C. Sec. 2000e-2(j) provides as follows:
 "Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area."